# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of | No. 53793-1-II |
| DAHLYLA LANG-KNIGHT, | |
| Respondent, | UNPUBLISHED OPINION |
| and | |
| CHRISTOPHER KNIGHT, | |
| Appellant. | |

MAXA, J. – Christopher Knight appeals the trial court's entry of a dissolution decree, findings of fact and conclusions of law, final parenting plan, and child support order. The parenting plan designated Knight's former wife, Dahlyla Lang-Knight, as the primary residential parent and imposed restrictions on Knight's decision making authority under RCW 26.09.191(3)(e).

We hold that (1) substantial evidence supports the trial court's finding that Knight engaged in abusive use of conflict, and (2) we will not consider Knight's other assignments of error because he failed to provide any argument regarding them. Accordingly, we affirm the trial court's dissolution orders.

FACTS

*Background*

Knight and Lang-Knight married in 2011. They had two children together, AK and EK, who were seven and five years old when Lang-Knight filed a petition for dissolution. Lang-Knight also had an older son, AL, from a previous marriage.

Lang-Knight was a stay-at-home mother from the time that AK was born until 2016, when she returned to the workforce as a full-time caregiver. She later started a cleaning business and took over some of her sister Tamara Bertrand's clients. Knight worked as a fabricator until he was fired in 2013. He subsequently worked on and off at three different fabrication companies, driving for Lyft, and as a substitute para-educator.

In March 2018, Lang-Knight filed a petition for dissolution of the marriage and a proposed temporary parenting plan. The proposed temporary parenting plan alleged that Knight had emotionally abused AK and EK, had a history of domestic violence, and had assaulted someone at home. The trial court subsequently entered a temporary parenting plan that designated Lang-Knight as the primary custodian of the children and the sole decision-maker relating to AK and EK's schooling and health care.

In August, the trial court assigned a family court services evaluator, Terry Vetter, to conduct an investigation with respect to Knight and Lang-Knight's family and a parenting plan. The court order included investigating Knight and Lang-Knight's mental health issues, determining who should be assigned the primary parent, determining a residential schedule, and determining whether any RCW 26.09.191 restrictions should apply.

In July 2019, the trial court held a two-day bench trial on the petition for dissolution, final parenting plan, and final child support order. Lang-Knight asked to be made the primary

residential parent with Knight having visitation rights, while Knight requested joint custody. Knight was self-represented at trial and Lang-Knight was represented by an attorney.

*Bertrand Testimony*

Bertrand testified about the state of Knight and Lang-Knight's family dynamics. She stated that she often acted as a mediator between Knight and Lang-Knight to get them to stop fighting and to discuss important matters. She also testified that Knight was unwilling to get a job, did not keep the house clean while he stayed at home, and that Knight would work on his computer in a different room while AK and EK entertained themselves in the main part of the house. Bertrand stated that Lang-Knight was an attentive mother and very involved with AK and EK's lives.

*Vetter Testimony*

Vetter testified about the evaluation he made regarding Knight and Lang-Knight. He stated that he found no basis for allegations of domestic abuse or child abuse and that the children were doing well in school. Vetter did not recommend any RCW 26.09.191 restrictions based on either Knight or Lang-Knight's mental health.

Vetter stated that both Knight and Lang-Knight indicated to him that there was some conflict between them and that they did not have the ability to cooperatively parent. Because of the conflict between the two parents, Vetter did not recommend that the trial court adopt the proposed shared parenting schedule in Knight's proposed parenting plan. Vetter explained that a shared-type residential program or parenting plan was not in the children's best interest when there is conflict between the parents. He stated that a shared-type parenting plan in that scenario typically resulted in children having more difficulties and aligned children with one parent over another parent.

Vetter ultimately recommended that Lang-Knight be designated as the primary residential parent because she already had been performing that function, had her family nearby as a support system, and unlike Knight, had not been diagnosed with depression and adult attention deficit disorder.

Vetter noted that there was conflict between Knight and Lang-Knight regarding the telephone communication provision in the temporary parenting plan. As a result, he recommended that the final parenting plan include a specific time on specific days that Knight could call AK and EK for 30 minutes. Vetter testified that it would be within the scope of his recommendation if Knight provided cell phones to AK and EK so long as they used the cell phones within the telephone communication schedule.

Vetter recommended that Knight and Lang-Knight use a shared notebook or technological application to communicate information related to their children rather than emails because emails were a source of conflict for the parents.

*Lang-Knight Testimony*

Lang-Knight requested that the court adopt an abusive use of conflict finding. She testified that Knight sent hostile emails that caused her stress and were not beneficial to raising their daughters. She explained that she attempted to communicate with Knight through Vetter's recommended notebook, but that Knight refused to return the notebook to her. She also stated that Knight did not follow the recommendation to not contact her except for purposes of facilitating telephone contact or to discuss the children's issues. Lang-Knight stated that even after court orders, Knight sent her emails with disparaging comments or other unrelated matters.

Lang-Knight testified that Knight did not follow the recommendation regarding the telephone contact. Instead, he provided a cell phone to their children, remotely turned on the

4

location tracker application to check their location, and texted and called their children on their cell phones whenever he wanted. After Lang-Knight returned the cell phones to Knight, he attempted to communicate with their children through Lang-Knight and AL, demanded that Lang-Knight allow their children to play computer games with him whenever he wanted, and demanded that he be allowed to speak with their children outside of the established times. When Lang-Knight asked Knight to stop contacting AL to communicate with AK and EK, he responded that he would contact AL whenever he wanted to.

Lang-Knight also stated that Knight would show up at school events when it was Lang-Knight's turn to have the children. She explained that Knight would take over at school events to the point where Lang-Knight could not participate in things with their children. She stated that one time, this caused extreme anxiety to AK, causing her to cry in a corner and asking Lang-Knight if they could go home. Lang-Knight explained that she did not feel comfortable visiting the children at lunch time on the off-chance that Knight also would be there.

Lang-Knight asked that Knight be limited to reasonable visitations during school lunchtime because he would visit the girls for lunch or volunteer at school up to four times a week. She stated that it was disruptive for the girls to have Knight there that often because they were unable to socialize with their friends during lunch.

Lang-Knight stated that when she asked Knight where he was living after he was evicted, he sent an angry email refusing to tell her his address in violation of the temporary parenting plan. When Lang-Knight sought an emergency order to restrict Knight's visits, she stated that Knight continued to refuse to provide his address. She stated that she voluntarily agreed to reinstate the parenting plan after Knight obtained suitable housing.

Lang-Knight testified that Knight had used AK and EK for purposes of soliciting funds on a website page to buy bunk beds. The website included pictures of AK and EK. This apparently was in violation of a provision in a court order that stated that he was not allowed to talk about Lang-Knight online or use AK or EK for purposes of financial gain.

*Knight Testimony*

Knight generally disagreed with Lang-Knight's characterization of some of the events above. He testified that Lang-Knight was difficult with respect to communicating information about their children, such as refusing to answer him when he asked her how AK was doing with attending the Boys and Girls Club. He also pointed to the fact that he was never notified about his daughter being taken to urgent care at one point.

Knight conceded that he did not follow proper procedure to return the shared notebook to Lang-Knight and explained that he refused to use the notebook because the notebook was kept in their daughter's backpack and she could read it on the way home on the bus.

*Trial Court Ruling*

Following trial, the trial court entered a final parenting plan designating Lang-Knight as the primary residential parent. The plan provided that the children would live with Knight every other weekend, every other Wednesday, and every other week in the summer.

The trial court ordered that Lang-Knight would have sole decision-making authority regarding the children's schooling and health care. The court limited Knight's decision making authority based on a finding that Knight engaged in abusive use of conflict "in a way that endangers or damages the psychological development of [AK and EK]." Clerk's Papers (CP) at 449. But the limitation applied only to decision making, not residential time. The court engaged in a lengthy colloquy to explain the reasoning behind its ruling.

Knight appeals the final dissolution decree, findings of fact and conclusions of law, final parenting-plan order, and final child support order.

ANALYSIS

A.    STANDARD OF REVIEW

A trial court has broad discretion in developing a parenting plan. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). This discretion is guided by (1) RCW 26.09.184, which states the objectives of a parenting plan and identifies the required provisions; (2) RCW 26.09.187(3)(a), which lists seven factors that the court must consider when adopting residential provisions; (3) RCW 26.09.002, which declares that the best interests of the child is the standard for determining parental responsibilities; (4) RCW 26.09.191(1)-(2), which provide certain factors that require limitations of a parent's decision-making and residential time, and (5) RCW 26.09.191(3), which provides certain factors that permit limitations on any parenting plan provisions. *See Katare*, 175 Wn.2d at 35-36.

We review a trial court's parenting plan for abuse of discretion. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). A trial court abuses its discretion when a decision is manifestly unreasonably or based on untenable grounds or reasons. *Id.* We review the trial court's findings of fact to determine whether substantial evidence supports them. *Id.* Evidence is substantial if it is sufficient in quantity to persuade a fair-minded person of the truth of the declared premise. *Id.* On appeal, we do not review the trial court's credibility determinations or reweigh the evidence. *Id.*

Appellate courts are extremely reluctant to disturb child placement decisions "[b]ecause the trial court hears evidence firsthand and has a unique opportunity to observe the witnesses." *In re Parenting & Support of C.T.*, 193 Wn. App. 427, 442, 378 P.3d 183 (2016).

B.     ABUSIVE USE OF CONFLICT

Knight argues that the trial court erred when it designated Lang-Knight as the primary residential parent and sole decision-making authority in part because Knight had engaged in an abusive use of conflict.  He claims that substantial evidence does not support the court's abusive use of conflict finding.  We disagree.

1.     Legal Principles

Under RCW 26.09.191(3)[1], the trial court has discretion to preclude or limit any provisions of the parenting plan if one of seven factors is present.  The rationale for imposing limitations on a parenting plan is that "[a] parent's involvement or conduct may have an adverse effect on the child's best interests."  RCW 26.09.191(3).  "The trial court has discretion to determine whether the evidence presented meets the requirements of RCW 26.09.191." *In re Parenting & Support of L.H.*, 198 Wn. App. 190, 194, 391 P.3d 490 (2016).

Relevant here, RCW 26.09.191(3)(e) states that a limitation on parenting plan provisions may be imposed when there is an "abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development."  A party is not required to show actual damage to the child's psychological development. *In re Marriage of Burrill*, 113 Wn. App. 863, 872, 56 P.3d 993 (2002).  Courts have made an abusive use of conflict finding when one parent has inserted a child into a parental conflict which could psychologically damage the child. *See id.* at 867-68.

---

[1] RCW 26.09.191 has been amended since the events of this case transpired.  Because these amendments do not impact the statutory language relied on by this court, we refer to the current statute.

2.    Analysis

The trial court did not specify the factual basis for its abusive use of conflict finding, but the court apparently found Lang-Knight's overall testimony credible. Lang-Knight testified that Knight consistently failed to abide by several provisions of the temporary parenting plan which caused significant conflict between her and Knight and great distress for their children. Specifically, the record shows that Knight attempted to insert himself into his children's lives in violation of the temporary parenting plan several times, which inevitably placed AK and EK in the middle of Knight and Lang-Knight's contentious dissolution proceedings. *See Burrill*, 113 Wn. App. at 867-68. Knight refused to use the recommended notebook to communicate with Lang-Knight and used AL to pass along messages to AK and EK. Finally, Knight used images of AK and EK for purposes of soliciting funds on a GoFundMe website without consulting Lang-Knight.

Based on Lang-Knight's testimony and corroborative testimony from Bertrand and Vetter, the evidence supports a finding that Knight was a significant source of conflict and that his failure to abide by the provisions in the temporary parenting plan posed as a danger of serious psychological damage to the children. Knight disagreed with Lang-Knight's characterization of the conflict between them and specific events, but it is within the trial court's discretion to weigh the evidence and determine witness credibility. *Black*, 188 Wn.2d at 127. For the same reason, Vetter's opinion that there should not be any RCW 26.09.191 restrictions is not fatal to the trial court's abusive use of conflict finding. Accordingly, we conclude that substantial evidence supports the trial court's finding of an abusive use of conflict.

Knight claims that the trial court's abusive use of conflict finding was inconsistent and confusing and that it was unclear whether the trial court actually limited Knight's residential time

on the basis of that finding. But the trial court's oral ruling clearly stated the abusive use of conflict finding, and the court stated that the finding would not affect the parenting schedule and was otherwise factored into the final parenting plan. This statement is consistent with the final parenting plan, which stated that "[t]here are no limitations or conditions that apply [under RCW 26.09.191] except for that of *decision making authority*" and that Lang-Knight had sole decision-making authority regarding school and health care in part because of the abusive use of conflict finding. CP at 450 (emphasis added). The parenting time schedule is separate from who has decision-making authority. Accordingly, we reject Knight's argument that the trial court's rulings were inconsistent and confusing.

Relying on *In re Marriage of Chandola*, 180 Wn.2d 632, 636, 327 P.3d 644 (2014), Knight also claims that the trial court was required to find evidence of a parent's problematic conduct and actual harm to the child caused by the conduct. But the court in *Chandola* imposed restrictions under RCW 26.09.131(3)(g), not under RCW 26.09.131(3)(e). 180 Wn.2d at 636. Restrictions based on an abusive use of conflict finding does not require actual psychological damage. *Burrill*, 113 Wn. App. at 872. A party only needs to show that there is a danger of such damage. *Id.* And as stated above, there is substantial evidence to support the trial court's abusive use of conflict finding.

We hold that the trial court did not err in finding that Knight had engaged in the abusive use of conflict justifying a limitation under RCW 26.09.191(3)(e).

C.      OTHER ASSIGNMENTS OF ERRORS

Knight lists several additional assignments of error regarding the trial court's entry of the dissolution decree, findings of fact and conclusions of law, final parenting plan, and child

support order. But Knight only makes vague, passing references to these assignments of error in his brief and presents no argument regarding them.

We generally do not consider an assignment of error if the appellant offers no argument regarding that assignment of error. *Cave Props. v. City of Bainbridge Island*, 199 Wn. App. 651, 667, 401 P.3d 327 (2017); *see also* RAP 10.3(a)(6). In addition, we hold self-represented litigants to the same standards as attorneys, who must comply with the rules of appellate procedure. *In re Marriage of Olson*, 69 Wn. App. 621, 626, 850 P.2d 527 (1993). Accordingly, we decline to address Knight's additional assignments of error because he does not offer any argument, authority, or citations to the record to support his claims.

D.       ATTORNEY FEES ON APPEAL

Lang-Knight argues that she should be awarded reasonable attorney fees under RAP 18.1, apparently on the grounds of Knight's alleged intransigence. We decline to award fees on appeal.

RAP 18.1(a) provides that a party may have a right to recover reasonable attorney fees on appeal if applicable law grants the party the right to do so. Here, Lang-Knight argues that this court may award attorney fees in a dissolution case based on a party's intransigence and obstruction, citing *Katare*, 175 Wn.2d at 42, and *Chandola*, 180 Wn.2d at 657. However, there is no indication of Knight's intransigence on appeal. Therefore, we decline to award attorney fees to Lang-Knight on this basis.

CONCLUSION

We affirm the trial court's dissolution orders.

No. 53793-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

WORSWICK, P.J.

CRUSER, J.